UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY FOSTER,

              Petitioner,

     -vs-

PATRICK GRIFFIN,
SUPERINTENDENT

             Respondent.

_____

**DECISION AND ORDER**
**No. 11-CV-0041(MAT)**

## I.   Introduction

*Pro se* Petitioner Anthony Foster("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered March 29, 2005, in New York State, Supreme Court, Monroe County, convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25(1)). Petitioner was sentenced to an indeterminate term of imprisonment of twenty five years to life.

## II.  Factual Background and Procedural History

On September 27, 2004, Petitioner was indicted by a Monroe County Grand Jury and charged with two counts of Murder in the Second Degree under intentional and reckless theories. <u>See</u> Ind. No. 856/04 at Resp't Ex. B.  The charges arose from an incident that occurred on August 7, 2004, at the intersection of Remington and Coleman Streets in the City of Rochester, New York, wherein

-1-

Petitioner shot Kenneth Becoats ("Becoats" or "the victim") with an assault rifle at close range, killing him.  After the shooting, Petitioner fled the jurisdiction and the police were unable to locate Petitioner until they obtained eavesdropping warrants to monitor Petitioner's phone calls.  On September 14, 2004, the police apprehended and arrested Petitioner as he arrived in Rochester on a train from Albany.  Three days later, five eyewitnesses to the shooting identified Petitioner in a police lineup.

Prior to trial, Petitioner's counsel filed an omnibus motion, wherein he moved, *inter alia*, to suppress evidence seized pursuant to the eavesdropping warrants, and requested a hearing pursuant to Franks v. Delaware.[1]  See Resp't Ex. B at 10-88.  The trial court summarily denied the request for the hearing, concluding that Petitioner failed to make a substantial preliminary showing that false statements were knowingly and intentionally included in the supporting affidavits.  Motion Mins. [M.M.] of 12/02/04 at 5.  The trial court also summarily denied Petitioner's motion to suppress evidence seized as a result of the eavesdropping warrant, concluding that the supporting affidavits "sufficiently apprise[d]

---

[1]

Franks v. Delaware, 438 U.S. 154 (1978) ("where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if allegedly false statement is necessary to the finding of probable cause, [the] [Fourth Amendment] requires that a hearing be held at defendant's request.")

the issuing court at that time of the nature and progress of the investigation" and the difficulties of using normal law enforcement methods.  M.M. at 5-6.

On February 28, 2005, Petitioner proceeded to trial before a jury in the Supreme Court, Monroe County before the Honorable Francis Affronti.

**A.   The Trial**

**1.   The People's Case**

On the evening of August 7, 2004, Becoats was sitting in a parked black Chevy, which belonged to Willie Siler ("Siler"), in front of a neighborhood market located at 338 Remington Street. Trial Trans. [T.T.] 511, 629.  That evening, Becoats' younger brother Eddie Becoats ("Eddie") went to the location after attending a party and spoke with his brother.  T.T. 511-516. During their conversation, Eddie saw Petitioner walking towards the vehicle carrying an assault rifle.  T.T. 516-517.  Eddie recognized the assault rifle as belonging to Jason Roldan ("Roldan"); Eddie had seen Roldan with the gun at Philipe Cruz's ("Cruz") house, which was nearby at the intersection of Coleman and Remington Streets.  T.T. 518-519.  Petitioner was wearing a "visor-like" hat, a tan coat, fatigue pants, and Timberland boots.  T.T. 516.  Eddie jumped out of the car and begged Petitioner not to shoot his brother.  T.T. 517-519.  In response, Petitioner smiled, then fatally shot Becoats.  T.T. 517, 984.  Eddie fled and told people

on the street that Petitioner had shot his brother.   T.T. 521.
Eddie did not know Petitioner by name at the time of the shooting,
but had seen him hanging around Coleman Street a couple months
prior to the shooting.   T.T. 521.

Earlier that same day, Andre Crockton ("Crockton") and Becoats
were observed on the corner of Coleman and Remington having a
disagreement.   T.T. 563-564, 629-630, 636, 768-770, 859.   Later
that day, Petitioner told Siler that Crockton was upset with
Becoats because Becoats was selling marijuana from the corner of
Coleman and Remington.   T.T. 642.   Siler told Petitioner not to get
involved with the disagreement between Crockton and Becoats.   T.T.
642.   Petitioner and Siler talked for a while longer, and then
Petitioner walked away.   T.T. 643.   Siler stood outside of the
houses on Remington Street and used his cell phone to call his
girlfriend.   T.T. 645.

At around 8:00 or 9:00 p.m. on the night of the incident,
Brandon Collier ("Collier"), Becoats' cousin, was standing in front
of the store at the corner of Coleman and Remington when he saw
Petitioner, Crockton, and Roldan walk from the corner to Cruz's
house on Coleman Street, where they momentarily disappeared from
Collier's view.   T.T. 565, 569.   When they reappeared, they had
split up; Crockton walked away from the store towards Clinton
Street, and Roldan and Petitioner walked towards the store, which
was on Remington Street.   Roldan then ducked into one of the houses

near the corner of Coleman and Remington, and Petitioner continued walking down Coleman Street towards the store.   T.T. 569-570. Petitioner was carrying an assault rifle, which Collier recognized as belonging to Roldan.   T.T. 565-572.   Collier saw Petitioner approach Siler's black Chevy, which was parked on Remington Street in front of the store, and fire a shot into the driver's side window of the car.   T.T. 572-574.   Collier did not know at the time that the victim was seated in the driver's seat of the car.   T.T. 574.   After the shooting, Collier saw Roldan grab the gun from Petitioner and flee to a house across the street from the crime scene.   T.T. 574-576.

In the interim, just before the shooting, Siler was talking to his girlfriend on his cell phone when he saw Petitioner walking towards Siler's car carrying an assault rifle.   T.T. 647.   Siler then saw Petitioner raise the rifle and heard him say, "what's good" before firing a shot into the driver's side window of the vehicle.   T.T. 647.   Siler tried to run away, but Petitioner stopped him and said, "Will, what the fuck you running for?"   Siler replied, "[m]an, you just shot that boy," and Petitioner told Siler to "keep his name off the streets."   Petitioner then fled down Remington Street.   T.T. 576, 648.

Meanwhile, Diane Downs ("Downs") and Keesha Rivers ("Rivers") both lived on Remington Street next to the crime scene and witnessed the shooting as they were sitting on their respective

porches.  T.T. 772-775, 860-863.  After the shooting, Downs saw
Siler approach Petitioner, whom she had never seen before, and
heard Petitioner say, "I got what I wanted."  T.T. 776, 778.  Downs
and Rivers both called 911.  T.T. 776, 882.  Rivers, who was a
nurse, provided medical aid to Becoats until the police arrived.
T.T. 864-865. At the time of the shooting, although Rivers did not
know Petitioner "personally," she knew who he was from seeing him
in the neighborhood.  T.T. 875.

Sergeant Anthony Debellis of the Rochester Police Department's
("RPD") Major Crimes Unit responded to the crime scene shortly
after the murder and saw Becoats lying in the front seat of Siler's
car.  T.T. 825-826.  Sergeant Debellis spoke to Downs and Rivers,
who were both crying.  T.T. 826.  Sergeant Debellis also spoke to
Roldan, who had been apprehended at the scene.  T.T. 827.  Crockton
went to the police station that night and voluntarily spoke with
Sergeant Debellis.  T.T. 827-828.  The police did not locate
Petitioner that night.

Two days after the murder, on August 9, 2004, Eddie and
Collier went to the police station where they were separately shown
two photo arrays.  Neither Eddie nor Collier identified anyone as
the shooter.  T.T. 521, 577-578, 828.  Ten days after the murder,
Siler went to the police station to report his observations with
respect to the night of the murder.  T.T. 651.  Sergeant Debellis

spoke to Eddie, Downs, Rivers, and Collier a second time in the days following the murder.  T.T. 829-830.

On August 16, 2004, the police still had not apprehended Petitioner, and the Special Investigation Section ("SIS") became involved in the investigation to locate Petitioner.  T.T. 830, 917. On Septemeber 13, 2004, after efforts to locate Petitioner were unsuccessful, SIS applied for and obtained eavesdropping warrants to monitor conversations on Petitioner's cell phones.  T.T. 919-922.  As a result of the information SIS obtained from monitoring Petitioner's calls, SIS apprehended and arrested Petitioner at the train station in Rochester on September 14, 2004.  T.T. 830-831, 940-943.

On September 17, 2004, after Petitioner's arrest, Eddie, Collier, Siler, Downs, and Rivers participated in a police conducted line-up and separately identified Petitioner as the person who shot and killed Becoats on August 7, 2004.  T.T. 523, 578-579, 651-652, 778-779, 833-837.

### 2.   Petitioner's Motion for a Mistrial

After the People's fifth witness (Siler) testified, the trial court cleared the courtroom of all spectators, and directed the jury to return to the jury room so that the prosecutor could address the court on the record with respect to an issue that had arisen during the recess.  The prosecutor informed the court that Robert Brown ("Brown"), the cousin of the victim who had been

present in the courtroom as a spectator, told the prosecutor during the recess that he recognized juror number four, Chicquanda Sanders ("Sanders"), as a woman he had known for the past six years.  T.T. 697, 710.  Brown told the prosecutor that, before Petitioner was apprehended, Sanders had agreed to locate Petitioner for Brown because Brown wanted to kill Petitioner.  T.T. 697.

After the prosecutor summarized the incident for the trial court, the trial court questioned Sanders concerning the truth of Brown's statements.  Sanders denied knowing Brown, Petitioner, or the victim, and denied knowing anything about the encounter described by Brown.  T.T. 699-705.  In response to the court's inquiry whether she had a nickname, Sanders initially said that she "had a lot of nicknames," but upon further questioning conceded that one of her nicknames was "Chicky Bird."  T.T. 701.

The court then questioned Brown, who stated that during the recess he told the prosecutor that he knew the fourth juror, who was known as "Chicky," and that she knew Petitioner.  T.T. 706. Brown further stated that before Petitioner was arrested, he had asked Sanders to find Petitioner for him, and Sanders agreed to help Brown.  T.T. 707-708.  Brown stated that the conversation took place in Sanders' car, and that after that conversation, Brown spoke to Sanders three or four times by telephone.  T.T. 707-710.

Based on the testimony of Sanders and Brown, Petitioner's attorney requested the court to discharge Sanders from the jury and

moved for a mistrial on the ground that Sanders's gross misconduct tainted the jury.  T.T. 714-715.  The prosecutor joined in the defense's application to have Sanders removed from the jury, but requested that the court question each of the remaining jurors before deciding whether a mistrial was appropriate.  T.T. 716.

The court discharged Sanders from further service.  T.T. 717-718.  With respect to Petitioner's application for a mistrial, the court reserved decision pending the individual voir dire of each of the jurors to determine whether they were affected or tainted as a result of serving with Sanders.  T.T. 720-721.  Said voire dire was conducted, at the close of which the court denied Petitioner's application for a mistrial.  T.T. 713-761.

### 3.    The Defense's Case

Petitioner did not present any evidence, and did not testify in his defense.

### 4.    Verdict and Sentence

The jury found Petitioner guilty of intentional murder in the second degree.[2]  T.T. 1120.  Petitioner was subsequently sentenced to an indeterminate prison term of twenty-five years to life. Sentencing Mins. [S.M.] 30-31.

---

[2]

Upon review of the Grand Jury Minutes, the trial court had previously dismissed the second count of the indictment charging Petitioner with reckless second-degree murder.  In dismissing that charge, the trial court concluded that the "point-blank shooting" of the victim, as described by the eyewitnesses to the murder, "[did] not qualify as depraved indifference murder."  See Decision and Order of the Supreme Court, Monroe County (Hon. Affronti), dated 12/14/04 at Resp't Ex. B at 279-280.

**B.    Petitioner's Direct Appeal**

Through counsel, Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department on the grounds that: (1) the eavesdropping warrants were illegal and the evidence obtained pursuant thereto should have been suppressed; and (2) Petitioner was denied a fair trial as a result of the prosecutor's misconduct during summation. See Pet'r Br. on Appeal at Resp't Ex. A.   The Appellate Division, Fourth Department unanimously affirmed Petitioner's conviction on November 21, 2006. People v. Foster, 59 A.D.3d 1008 (4th Dep't 2008) (Resp't Ex. D); lv. denied, 12 N.Y.3d 816 (2009) (Resp't Ex. G).

**C.    Petitioner's Motion for a Writ of Error Coram Nobis**

On May 6, 2010, Petitioner filed a *pro se* motion for a writ of error coram nobis in the Appellate Division, Fourth Department, alleging that he was denied the effective assistance of appellate counsel. See Pet'r Motion for a Writ of Error Coram Nobis at Resp't Ex. H.   On July 2, 2010, the Appellate Division, Fourth Department summarily denied Petitioner's motion. People v. Foster, 75 A.D.3d 1114 (4th Dep't 2010) (Resp't Ex. K), lv. denied, 15 N.Y.3d 893 (2010) (Resp't Ex. M).

**D.    The Habeas Corpus Petition**

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) that he was denied his constitutional right to a jury of his peers because the only two

African Americans on the petit jury were discharged; (2) the trial court erroneously failed to grant Petitioner's application for a mistrial on the ground that the jury was tainted; (3) ineffective assistance of trial counsel because counsel failed to object to the trial court's refusal to allow Petitioner to introduce evidence of Petitioner's outstanding parole violation; (4) ineffective assistance of appellate counsel; (5) a Fourth Amendment violation; and (6) prosecutorial misconduct. See Pet. ¶ 22; Appendices 1-4 (Dkt. No. 1); Supporting Memo. of Law (Dkt. No. 21).

For the reasons set forth below, habeas relief is denied and the petition is dismissed.

## III. Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). As Respondent correctly asserts and as discussed in detail below, Petitioner's Fourth Amendment and ineffective assistance of appellate counsel claims are exhausted, while Petitioner's remaining claims are unexhausted. See Resp't Mem. of Law at 19-25 (Dkt. No. 14).

## IV.  General Principles Applicable to Habeas Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

## V.  Analysis of the Petition

### 1.  Fourth Amendment Claim

In ground three of the petition, Petitioner claims, as he did on direct appeal, that his conviction was obtained in violation of his Fourth Amendment rights because the trial court denied his motion to suppress evidence obtained as a result of the allegedly illegal eavesdropping warrants. See Pet. ¶ 22C, Appendix 3. The Appellate Division, Fourth Department rejected this claim on the merits, finding that

> Supreme Court properly refused to suppress evidence obtained as a result of eavesdropping warrants. The information submitted by the police in support of the eavesdropping warrant application, tested in a practical and commonsense fashion in the context of the objectives of the investigation, contained a sufficient showing that normal investigative

> procedures have been tried and have failed, or
> reasonably appear to be unlikely to succeed if
> tried.  One objective of the eavesdropping
> warrants was to ascertain defendant's
> location, and the police officer's supporting
> affidavit set forth in detail the resistance
> of defendant's known associates in cooperating
> with the police, as well as the
> ineffectiveness of the surveillance methods
> previously employed.

Foster, 59 A.D.3d at 1009 (internal citations and quotations omitted).  This claim is barred from habeas review.

Where, as here, "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus review is unavailable with regard to a contention that evidence recovered through an illegal search or seizure was introduced at trial.  Stone v. Powell, 428 U.S. 465, 481-482 (1976); accord, e.g., Graham v. Costello, 299 F.3d 129, 133-34 (2d Cir. 2002).  The Second Circuit has explained that all Stone v. Powell requires is that the State provide the petitioner the "opportunity" to litigate a Fourth Amendment claim.  McPhail v. Warden, Attica Corr. Fac., 707 F.2d 67, 69-70 (2d Cir. 1983).  As interpreted by the Second Circuit, Powell may allow a petitioner to receive habeas review of a Fourth Amendment claim if he can demonstrate either (1) that the State failed to provide any "corrective procedures" by which Fourth Amendment claims could be litigated; or (2) that the State had such procedures in place, but that the petitioner was unable to avail himself of those procedures

"because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

Initially, Petitioner does not, and cannot, contend that New York failed to provide appropriate corrective procedures to address his Fourth Amendment claim. "[T]he federal courts have approved New York's procedure for litigating Fourth Amendment claims," embodied in New York's Criminal Procedure Law ("CPL") §§ 710.20 to 710.70, as "facially adequate." Capellan, 975 F.2d at 70 n.1 (internal quotation and citations omitted). Here, prior to trial, Petitioner moved, pursuant to CPL Article 700, to suppress the evidence seized pursuant to the eavesdropping warrants and also requested a hearing pursuant to Franks v. Delaware. See Resp't Ex. B at 10-88. Based upon the papers, the trial court summarily denied both of Petitioner's requests. M.M. of 12/02/04 at 5-6. In denying Petitioner's request for the hearing, the trial court found that Petitioner had "failed to make a substantial preliminary showing that false statements were knowingly and intelligently included in the supporting affidavits." M.M. at 5. In denying Petitioner's suppression request, the trial court found that "the supporting affidavit . . . sufficiently apprise[d] the issuing court at that time of the nature and progress of the investigation . . . as well as the difficulties inherent in the use of normal law enforcement methods sufficient to ensure that eavesdropping was more than a useful tool in the investigation." M.M. at 6. On

-14-

direct appeal, Petitioner challenged the trial court's denial of his motion to suppress the evidence obtained as a result of the eavesdropping warrants, and the appellate court affirmed the lower court's ruling.  <u>Foster</u>, 59 A.D.3d at 1009.  Thus, Petitioner was provided, as mandated by <u>Powell</u>, with a full and fair opportunity to litigate his Fourth Amendment claim in the state courts.

Moreover, Petitioner cannot demonstrate that there was an "unconscionable breakdown in the state's [corrective] process[,]" which "calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." <u>Cappiello v. Hoke</u>, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988), <u>aff'd</u>, 852 F.2d 59 (2d Cir. 1988). In this case, Petitioner's argument amounts to nothing more than disagreement with the trial court's and appellate court's decisions on his Fourth Amendment issue.  A petitioner's mere disagreement with the outcome of the state courts' rulings "is not the equivalent of an unconscionable breakdown in the state's corrective process." <u>Capellan</u>, 975 F.2d at 72; <u>accord, e.g.</u>, <u>Watkins v. Perez</u>, No. 05 Civ. 477(GEL), 2007 U.S. Dist. LEXIS 33736, 2007 WL 1344163, *23 (S.D.N.Y. May 30, 2007) (holding that without more, rejection by state appellate court of petitioner's Fourth Amendment claims, is not an "conscionable breakdown" in the state's corrective process; noting that a "habeas court cannot grant relief simply because it may disagree with the state court's resolution of the

claim"); <u>Gonzalez v. Superintendent, Sullivan Corr. Fac.</u>, 761 F. Supp. 973, 977 (E.D.N.Y. 1991) (state court denied habeas petitioner's request for a probable cause hearing because petitioner did not advance sufficient sworn allegations in his motion papers; district court held that denial of probable cause hearing was not an "unconscionable breakdown" in the process afforded by the state; petitioner was provided with a full and fair opportunity to litigate his fourth amendment claim in the state courts; "[t]he fact that petitioner was denied his request for such a hearing does not, in and of itself, affect the legitimacy of the state process").

Accordingly, Petitioner's Fourth Amendment claim is barred from habeas review by <u>Powell</u> and is denied on that basis.

## 2. Ineffective Assistance of Appellate Counsel

At ground two of the petition, Petitioner claims, as he did in his coram nobis application, that he received ineffective assistance of appellate counsel. <u>See</u> Pet. ¶ 22B, Appendix 2. The Appellate Division, Fourth Department adjudicated this claim on the merits when it summarily denied Petitioner's coram nobis application. <u>See</u> <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784-785 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the

contrary."). Thus, AEDPA applies, and, under said standard, Petitioner's claim is meritless.

When a petitioner asserts that he/she was denied the effective assistance of appellate counsel, a federal court must review appellate counsel's performance according to the two-pronged standard established for reviewing a trial counsel's performance in Strickland v. Washington, 466 U.S. 668 (1984). This test requires that petitioner demonstrate that counsel's performance fell below an objective standard of reasonableness, and that there is a "reasonable probability" the outcome would have been different, but for counsel's alleged error. Strickland, 466 U.S. at 688-94.

Mere omission of a non-frivolous argument is insufficient to demonstrate constitutionally deficient performance. Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)), cert. denied, 513 U.S. 820 (1994). To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that his/her claim would have been successful before the state's highest court. Mayo, 13 F.3d at 534 (quotation omitted).

Initially, the Court recognizes that appellate counsel filed a thorough, well-researched brief in which he persuasively argued two issues: that the government failed to demonstrate that electronic eavesdropping was absolutely necessary and that conventional methods of investigation had failed; and, that the

district attorney engaged in prosecutorial misconduct during summation when he made critical references to testimony that the judge ruled was not admissible. <u>See</u> Pet'r Br. on Appeal at Resp't Ex. B.  Nonetheless, Petitioner faults appellate counsel for failing to raise certain "viable . . . issues"[3] on direct appeal, which Petitioner urged appellate counsel to raise.  Pet. at Appendix 2.  Such a claim provides no basis for habeas relief insofar as "[e]ven if a claim is nonfrivolous, counsel is not required to present every claim on behalf of a defendant appealing his or her conviction." <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000) ("Appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citing <u>Barnes</u>, 463 U.S. at 751); <u>Wright v. United States</u>, 182 F.3d 458, 466 (6th Cir. 1999) ("Appellate counsel is not ineffective simply because he or she decides not to raise every possible argument on appeal.") (citing <u>Barnes</u>, 463 U.S. at 753). Notably, the record reflects that in response to a letter from Petitioner dated July 21, 2008, appellate counsel explained, in detail, why Petitioner's proposed claims would not succeed, and

---

[3]   In the petition, Petitioner does not expressly state which claims he urged his appellate counsel to include in his counseled appellate brief.  However, attached to Petitioner's coram nobis application is a letter dated July 21, 2004, in which Petitioner urged his appellate counsel to argue that: (1) the trial court erred in admitting the autopsy photos into evidence; and (2) the trial court erred in refusing to allow Petitioner to admit evidence of his flight from a parole violation into evidence.  <u>See</u> Pet'r letter to appellate counsel of 07/21/04 at Resp't Ex. H.

urged Petitioner to file his own *pro se* supplemental brief if he
still wished to raise the claims.  <u>See</u> appellate counsel's letter
of July 28, 2008 annexed to Petitioner's motion for a writ of error
coram nobis at Resp't Ex. H.   Moreover, Petitioner has not
demonstrated that any of the following issues he faults appellate
counsel for failing to raise are meritorious.  Indeed, appellate
counsel cannot be faulted for failing to raise non-meritorious
claims.  <u>See</u> <u>United States v. Arena</u>, 180 F.3d 380, 396 (2d Cir.
1999) ("Failure to make a meritless argument does not amount to
ineffective assistance.").

**(A)   Appellate Counsel was Not Ineffective for Failing to
Argue that the Trial Court Erred in Denying Petitioner's
Motion for a Mistrial**

Petitioner claims that appellate counsel was ineffective for
failing to argue that the trial court erred in denying Petitioner's
motion for a mistrial on the basis that the jury was tainted by the
misconduct of discharged juror Sanders.  <u>See</u> Pet., Appendix 2.
This claim lacks merit.

The record reflects that after juror Sanders was discharged,
the trial court properly conducted voir dire of each individual
juror to determine whether each juror had interacted with Sanders
and, if so, whether that interaction affected his/her ability to be
fair and impartial.  T.T. 722-748.  Based on the voir dire, the
court properly denied Petitioner's motion for a mistrial,
concluding that the remaining jurors were not tainted in any way by

serving with Sanders.   T.T. 759-761.   The record, which amply supports the trial court's findings, reflects that some of the jurors did not have any interaction with Sanders.   T.T. 726, 735, 737-739, 742, 744-745.   Further, the only juror who indicated she had interaction with Sanders unequivocally informed the court that her ability to be fair and impartial was not affected by the interaction.   T.T. 728-732.   The remaining jurors had only limited contact with Sanders, and did not hear her say anything about Petitioner, the victim, or the families of either Petitioner or the victim.   T.T. 723-724, 733-734, 739-741, 744, 746.   Thus, after conducting a pointed inquiry of each of the jurors and determining that the jury had not been tainted by the misconduct of Sanders, the trial court properly denied Petitioner's motion for a mistrial. Therefore, this Court cannot find that Petitioner's appellate counsel was ineffective for failing to raise this non-meritorious claim on direct appeal.   This portion of Petitioner's ineffective assistance of appellate counsel claim is denied.

**(B)   Appellate Counsel was Not Ineffective for Failing to Argue that the Trial Court Erred in Refusing to Allow Admission of Petitioner's Hearsay Statement Concerning his Outstanding Parole Violation**

Petitioner claims that appellate counsel was ineffective because he failed to argue that the trial court erred in refusing the admission of Petitioner's hearsay statement concerning an outstanding parole violation as an admission against penal interest.   According to Petitioner, the purpose of admitting this

statement was to establish that Petitioner fled the jurisdiction after the crime because he believed that he had failed a drug test, not because he was a suspect in a homicide investigation. T.T. 850; Pet., Appendix 2.  This claim lacks merit.

Hearsay declarations against penal interest are admissible in New York if four preconditions are met: (1) the declarant is unavailable; (2) the declarant was aware when the statement was made that it was against his penal interest; (3) the declarant had competent knowledge of the facts; and (4) there is some proof independent of the statement itself which tends to confirm the facts asserted in the statement.  See Prince, Richardson on Evidence § 8-403;  see also People v. Morgan, 76 N.Y.2d 493, 497-98 (1990); People v. Brensic, 70 N.Y.2d 9, 15 (1987); People v. Thomas, 68 N.Y.2d 194, 197 (1986);  Barnes v. Burge, 372 F. App'x 196, 201 (2d Cir. 2010) (reciting New York elements).

The record reflects that, while cross-examining RPD Investigator Randall Benjamin, the defense attempted to elicit testimony from him that Petitioner, when arrested, stated that he (Petitioner) knew the police "didn't do all this for just a parole violation," which Petitioner alleged was outstanding due to a failed urine test.  T.T. 846.  The defense argued for admission of the hearsay statement as a declaration against penal interest. T.T. 846.  The prosecution countered, arguing that Petitioner made the statement "where he felt he was helping himself, not

incriminating himself." T.T. 847. The trial court, after permitting oral arguments from both parties and after conducting its own research and finding no caselaw to support the defense's position, correctly ruled that, in the context in which Petitioner intended to elicit the statement, said statement was self-serving and did not represent an admission against his penal interest. T.T. 847; see People v. Hill, 281 A.D.2d 917, 918-919 (4th Dep't 2001) (holding that "[t]he court properly precluded defense counsel from questioning the arresting officer concerning self-serving exculpatory statements made by defendant at the time of his arrest because those statements constituted inadmissible hearsay.") (citing People v. Middleton, 247 A.D.2d 713, 714 (3d Dep't 1998), lv. denied, 92 N.Y.2d 856 (1998); People v. Weston, 249 A.D.2d 496 (2d Dep't 1998), lv. denied, 92 N.Y.2d 931 (1998); People v. Riddick, 229 A.D.2d 453, 454 (2d Dep't 1996), lv. denied, 88 N.Y.2d 993 (1996)). Thus, because the trial court correctly ruled that the statement was inadmissible hearsay, Petitioner's appellate counsel was not ineffective for choosing not to raise this non-meritorious issue on direct appeal. This portion of his ineffective assistance of counsel claim is therefore denied.

**(C) Appellate Counsel was Not Ineffective for Failing to Argue that the Trial Court Erred in Admitting Autopsy Photos into Evidence**

Petitioner claims that appellate counsel was ineffective because he failed to argue that the trial court erred in admitted

autopsy photographs of the victim into evidence.  Pet., Appendix 2.
This claim also lacks merit.

Under New York law, demonstrative or physical evidence is
generally admissible if, for instance, "it tends to prove or
disprove a disputed or material issue."  People v. Pobliner,
32 N.Y.2d 356, 369 (1973), cert denied, 416 U.S. 905 (1974)
(citations omitted).  Accordingly, photographs of homicide victims,
even if "gruesome and . . . tending to arouse passion . . . against
the defendant in the minds of the jury," id. at 369-70, "should be
excluded only if their sole purpose is to arouse the emotions of
the jury and to prejudice the defendant."  Id. at 370.

Here, the prosecutor offered three autopsy photographs of the
victim for admission into evidence, arguing in support of admission
that the photos were relevant to the testimony of the medical
examiner with respect to the nature/type of the gunshot wounds.
T.T. 947-948.  Petitioner's counsel objected to the admission of
the photographs on the ground that, pursuant to Pobliner, the
prejudicial effect of the photos would far outweigh their probative
value.  T.T. 946.  In response to counsel's objections, the
prosecutor offered to partially redact one of the photos, which
depicted the victim, unclothed, on a gurney.  T.T. 947.  The court,
after reviewing the photos in light of counsel's objections,
admitted them into evidence subject to the redaction proffered by
the prosecution.  T.T. 948.

Based on the foregoing, there is nothing in the record to support a claim that the trial court abused its discretion in admitting the autopsy photos of the victim at trial.  At the request of the defense, the one particular photo depicting the victim unclothed on a gurney was redacted and, as such, was admitted into evidence.  Indeed, Petitioner does not and cannot claim that the sole purpose for admitting the photos was to "arouse the emotions of the jury and to prejudice [him]."  Pobliner, 32 N.Y.2d at 369.  Accordingly, it cannot be said that appellate counsel was ineffective for failing to raise this non-meritorious issue on direct appeal.  This portion of Petitioner's ineffective assistance of appellate counsel is therefore denied.

In sum, the state court's adjudication of Petitioner's ineffective assistance of appellate counsel claim was not contrary to, nor an unreasonable application of clearly established federal law.  Nor can it be said that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d)(1)-(2).  Petitioner's ineffective assistance of appellate counsel claim is therefore denied in its entirety.

### 3. Petitioner's Remaining Claims are Unexhausted but Deemed Exhausted and Procedurally Defaulted from Habeas Review

At grounds one, two and four of the petition, Petitioner argues that: (1) he was denied his constitutional right to a jury of his peers because the only two African Americans on the petit

-24-

jury were discharged; (2) the trial court erred in failing to grant his motion for a mistrial on the ground that the jury was tainted; (3) ineffective assistance of trial counsel on the grounds that trial counsel failed to object to the court's refusal to allow Petitioner to introduce evidence of his outstanding parole violation; and (4) he was denied his right to a fair trial as a result of the prosecutor's misconduct in introducing autopsy photos of the victim into evidence and in making various improper remarks on summation. See Pet. ¶ 22A, B, D; Appendices 1, 2, 4. All of these claims -- albeit for different reasons -- are unexhausted. Because Petitioner no longer has a state court forum in which to exhaust the claims, the Court deems them exhausted but procedurally defaulted.

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). Petitioner has failed to do so with respect to his remaining claims. Petitioner's claims that he was denied his constitutional right to a jury of his peers because the only two African Americans on the petit jury were discharged, the trial court erred in failing to grant his motion for a mistrial on the ground that the jury was tainted, that he received ineffective assistance of trial counsel because trial

counsel failed to object to the court's refusal to allow Petitioner to introduce evidence of his outstanding parole violation, that the prosecutor committed misconduct by introducing the autopsy photos of the victim into evidence and by, on summation, shifting the burden and for "stereotyp[ing] Petitioner as a typical inner-city black criminal to an all Caucasian jury" (see Appendix 4) are unexhausted because they are being raised for the first time in the habeas petition.

Furthermore, Petitioner's allegation that the prosecutor engaged in misconduct on summation when he improperly argued that eyewitness Rivers did not identify Petitioner as the shooter on the night of the crime when she spoke with police because "she was afraid he [Petitioner] would retaliate against her" is similarly unexhausted, but for a different reason.   T.T. 1062; Pet., Appendix 4.   The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained. Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000) (citing Grey v. Hoke, 933 F.2d 117, 119 (2d Cir. 1991)).   Here, the record reflects that Petitioner failed to do so.   Although he raised this particular prosecutorial misconduct claim on direct appeal, he failed to seek review of it in his leave application to the New York Court of Appeals.   Rather, he sought leave to appeal solely "to determine whether the government's allegations of

necessity and investigative failure were sufficient to trigger the issuance of the eavesdropping warrant herein." See Pet'r Leave Application at Resp't Ex. B.  In doing so, Petitioner abandoned this claim. See Jordan v. Lefevre, 206 F.3d 196, 198-199 (2d Cir. 2000) (concluding "that arguing one claim in his [leave] letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction.").  Thus, this particular prosecutorial misconduct claim remains unexhausted.

Nonetheless, because Petitioner no longer has a state court forum in which to exhaust any of the aforementioned record-based claims, the Court deems them exhausted, but procedurally defaulted from habeas review.  See Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991) ("[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.'") (quoting Harris v. Reed, 489 U.S. 255, 263 n.9 (1989)); Spence v. Superintendent, 219 F.3d 162, 170 (2d Cir. 2000) ("Because [petitioner] failed to raise his claim in the ordinary appellate process and can now no longer do so, it is procedurally defaulted.")); CPL § 440.10(2)(c) (court must deny motion to vacate where claim is matter of record that could have been raised on direct appeal but unjustifiably was not).

A finding of procedural default precludes habeas review of the federal claim, unless the petitioner can show "cause" for the default and "prejudice" attributable thereto, Murray v. Carrier, 477 U.S. 478, 485 (1986), or demonstrate that the failure to consider the federal claim on habeas review will result in a "fundamental miscarriage of justice." Id. at 495 (quoting Engle v. Isaac, 456 U.S. 107, 135 (1982)). Petitioner does not explicitly allege cause for the default; however, he does raise a stand-alone ineffective assistance of appellate counsel claim, which the Court liberally construes as an attempt to establish cause. See Pet. ¶ 22B, Appendix 2. Ineffective assistance of counsel may constitute cause for a petitioner's failure to pursue a constitutional claim, e.g., Edwards v. Carpenter, 529 U.S. 446 (2000), but in order to constitute cause, counsel's ineffectiveness must itself rise to the level of a constitutional violation. Id. Here, Petitioner's stand-alone ineffective assistance of appellate counsel claim lacks merit (see Section "V, 2"), and, consequently, Petitioner cannot establish "cause" for the procedural default. Because Petitioner cannot establish cause, the Court need not consider prejudice. See McCleskey v. Zant, 499 U.S. 467, 494 (1991) (failure to make a showing of either cause or prejudice defeats the petitioner's ability to overcome the procedural default on this basis); Murray, 477 U.S. at 496 (adhering to the cause-and-prejudice test "in the conjunctive").

-28-

Furthermore, Petitioner has not alleged facts sufficient to avail himself of the "fundamental miscarriage of justice" exception. A miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. There is nothing in the record to suggest that such exceptional circumstances are present here. Because Petitioner cannot overcome the procedural default by demonstrating that a miscarriage of justice will result if his claims are not heard, they are barred from further review.

Accordingly, Petitioner's remaining claims are procedurally defaulted and denied on that basis.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      March 8, 2012
            Rochester, New York